IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTH CAROLINA<br><br>Plaintiffs<br>v.<br><br>SPARTANBURG COUNTY; CHUCK WRIGHT, in his official capacity as the Spartanburg County Sheriff; and ALLEN FREEMAN, in his official capacity as administrator of the Spartanburg Detention Center,<br><br>Defendants. | Case No. 7:17-cv-01145-TMC<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## INTRODUCTION

This case challenges the constitutionality of Defendant Spartanburg County's policy, practice, and custom of preventing civil rights organizations and their cooperating attorneys from exercising their First Amendment right to speak in person with inmates incarcerated in the Spartanburg County Detention Center ("Detention Center"). Plaintiffs American Civil Liberties Union Foundation ("ACLU") and American Civil Liberties Union Foundation of South Carolina ("ACLU-SC") are investigating the violation of constitutional rights of people incarcerated in the Detention Center. Defendants Sheriff Chuck Wright and Major Allen Freeman jointly operate the Detention Center and serve as Defendant Spartanburg County's final policymakers concerning the Detention Center's policies, practices, and customs for attorney visits with inmates. Defendants enforce an unconstitutional policy, practice, and custom of prohibiting Plaintiffs from speaking in person with Detention Center inmates. As a result, Plaintiffs are

unable to inform Detention Center inmates of their rights, learn of constitutional violations the inmates have suffered, or determine whether inmates have viable legal claims.

Plaintiffs seek a preliminary injunction prohibiting Defendants from denying Plaintiffs and their cooperating attorneys the ability to speak in person with Detention Center inmates. Plaintiffs are likely to prevail on their constitutional claims and without interim relief, Plaintiffs will continue to suffer the irreparable harm of being denied the right to speak to inmates about their civil rights, learn of violations the inmates have suffered, and determine whether inmates have viable legal claims. Because Plaintiffs are willing to accommodate any reasonable restrictions on the date and time of in-person attorney meetings with Detention Center inmates, the government's interests will be amply protected. Accordingly, the Court should grant Plaintiffs' motion for a preliminary injunction in Plaintiffs' favor.

## BACKGROUND

**A.     Plaintiffs ACLU and ACLU-SC have been investigating constitutional violations related to South Carolina's summary courts for more than two years.**

Plaintiff ACLU is a nationwide civil rights organization whose mission is to protect and defend the constitutional rights and civil liberties of everyone in this country, including the least popular members of our society. Plaintiff ACLU-SC is the South Carolina affiliate of the ACLU. Both organizations work in courts, legislatures, and communities to advocate for civil rights and civil liberties for all.

For more than two years, the ACLU and ACLU-SC have been investigating constitutional violations related to proceedings in South Carolina summary courts. The term "summary courts" is used to collectively describe municipal and magistrate courts in South Carolina, which have jurisdiction to preside over low-level misdemeanor charges such as traffic offenses, simple drug offenses, and shoplifting offenses. While these charges are minor, the

potential consequences for accused persons are substantial, particularly when their constitutional rights are violated.

In 2016, the ACLU, ACLU-SC, and the National Association of Criminal Defense Lawyers ("NACDL") published a report detailing deficiencies in South Carolina's summary court system, resulting constitutional violations, and the consequences for indigent people. *See* Diane DePietropaolo Price et al., Summary Injustice: A Look at Constitutional Deficiencies in South Carolina's Summary Courts (2016), https://www.aclu.org/sites/default/files/field_document/summaryinjustice2016_nacdl_aclu.pdf.  Subsequently, NACDL published a follow-up report presenting additional findings concerning South Carolina's summary courts. *See* Alisa Smith et al., Rush to Judgment: How South Carolina's Summary Courts Fail to Protect Constitutional Rights (2017), https://www.nacdl.org/RushToJudgement/.  The reports found, among other things, that indigent people in South Carolina's summary courts routinely proceed without being informed of their constitutional right to a public defender or a jury trial; without being assessed for flight risk and danger to the community before having to pay a money bond in order to secure pretrial release; and without being questioned about their financial circumstances before being jailed for nonpayment of court-imposed fines and fees.  As set forth in both reports, these constitutional violations cause a large number of indigent people to be incarcerated in South Carolina's county jails.  Price et al., *supra* at 7; *see also* Smith et al., *supra* at 6–7.

**B.     Plaintiffs are investigating alleged violations of the constitutional rights of inmates currently detained in the Spartanburg County Detention Center.**

Following up on the findings of the summary courts reports, the ACLU and ACLU-SC have been jointly investigating alleged violations of the constitutional rights of indigent people incarcerated in county jails throughout South Carolina, including the Spartanburg County Detention Center.  The ACLU and ACLU-SC are working on the investigation with attorneys

Toby Marshall and Eric Nusser of Terrell Marshall Law Group PLLC ("Terrell Marshall"). Mr. Marshall and Mr. Nusser act as ACLU and ACLU-SC cooperating attorneys in the course of investigating alleged violations of the constitutional rights of incarcerated indigent people, including through interviews of inmates incarcerated in the Detention Center.

C. **Defendants denied the ACLU and ACLU-SC access to speak with inmates inside the Detention Center pursuant to a stated policy.**

Spartanburg County has a written policy, published on the Detention Center's website, providing that all professional visits, including those by attorneys, "should be scheduled in advance through the Director's Office." Declaration of Nusrat J. Choudhury ("Choudhury Decl.") ¶ 2 & Ex. A. On December 1, 2016, Nusrat Choudhury, a senior staff attorney at the ACLU, called and emailed Major Neal Urch, then director of the Detention Center, to request permission for the ACLU, ACLU-SC, and attorneys working with both organizations to conduct interviews with inmates. *Id.* ¶¶ 3–4. Major Urch directed Ms. Choudhury to submit the request to Defendant Freeman and instructed Ms. Choudhury to identify the specific inmates with whom meetings were sought. *Id.* ¶ 3.

On December 2, 2016, attorney Candy M. Kern-Fuller of the Upstate Law Group, who was working with the ACLU and ACLU-SC at the time, left a message on Defendant Freeman's office phone and sent an email to Defendant Freeman requesting permission on behalf of herself and Linda Moon, an ACLU legal fellow, to meet with twenty-seven Detention Center inmates. Declaration of Candy M. Kern-Fuller ("Kern-Fuller Decl.") ¶¶ 3–4 & Ex. A. The email identified each inmate by name and requested permission for Ms. Kern-Fuller and Ms. Moon to meet with the inmates during specific dates and times over a four-day period. *Id.* All dates and times were in compliance with the published policies for professional visitors. *Id.*; *see also* Choudhury Decl. Ex. A.

4

Within an hour, Defendant Freeman responded by email:

> The only visit allowed would be those of Attorneys th[at] represent Inmates in criminal, civil or family court proceedings. Our public defender has representation in the facility daily Monday-Friday. We do not allow any visitation inside our facility otherwise. My question [sic] do you represent the below in any of the proceedings I listed?

Kern-Fuller Decl. Ex. A.

On December 7, 2016, Ms. Choudhury sent a letter ("Demand Letter") to Defendant Freeman again requesting permission for the ACLU and ACLU-SC to meet with Detention Center inmates concerning civil rights issues. Choudhury Decl. ¶¶ 5–7 & Exs. C–D. Ms. Choudhury specifically requested that such permission be granted to attorneys from the ACLU, Upstate Law Group, and Terrell Marshall. *Id.* Ms. Choudhury also notified Defendant Freeman that the Detention Center's policy of limiting visits with inmates to "attorneys already representing the inmates in criminal, civil, or family court proceedings" is contrary to rights protected by the United States Constitution. *Id.* The ACLU did not receive any response to the letter from Defendant Freeman. *Id.* ¶¶ 5–6.

On December 9, 2016, Ms. Choudhury forwarded the Demand Letter to Defendant Wright, the Spartanburg County Sheriff and final policymaker concerning the Detention Center's policies and practices. *Id.* ¶¶ 7, 9–10 & Exs. D, F. That same day, Sheriff Wright sent an email denying Ms. Choudhury's request for the ACLU and ACLU-SC to meet with inmates in the Detention Center. *Id.* ¶¶ 9–10 & Ex. F. Sheriff Wright's response stated in full: "We are speaking with our Attorneys and I am saying no to your requests at this time. Should the Attorneys say anything different, Your request are denied [sic]." *Id.* There have been no communications from Sheriff Wright or the County's attorneys following up on the Sheriff's email of December 9, 2016. *Id.* ¶ 11.

**D.     Defendants initially allowed Mr. Marshall and Mr. Nusser to speak with inmates inside the Detention Center.**

On December 12 and 13, 2016, Mr. Marshall, Mr. Nusser, and Howard E. Sutter III, an attorney with Upstate Law Group, visited the Spartanburg County Detention Center in order to interview inmates on behalf of the ACLU and ACLU-SC.  Declaration of Toby J. Marshall ("Marshall Decl.") ¶¶ 3, 8.  When they arrived each of those days, Mr. Marshall, Mr. Nusser, and Mr. Sutter provided the officer at the front desk with a list of inmates they sought to interview.  *Id*. ¶¶ 4, 8–9.  The officer identified the locations of the inmates, all of whom were housed either on-site at the Detention Center or off-site in a facility called the Annex 2, but made no inquiry as to whether Mr. Marshall, Mr. Nusser, or Mr. Sutter represented the inmates.  *Id*. ¶¶ 4–6, 9.  The officer looked at the driver's licenses and bar cards of Mr. Marshall, Mr. Nusser, and Mr. Sutter, issued them name tags, and allowed them to enter the Detention Center.  *Id*. ¶¶ 5, 8.  Mr. Marshall, Mr. Nusser, and Mr. Sutter met with female inmates inside a room in the booking area.  *Id*. ¶¶ 7, 10.  Mr. Marshall and Mr. Nusser also met with male defendants in various pods throughout the Detention Center.  *Id*. ¶ 11.

On December 13, 2016, Mr. Marshall and Mr. Nusser visited the Annex 2.  *Id*. ¶ 12.  Mr. Marshall and Mr. Nusser informed the officer at the front desk that they wished to speak with a number of inmates.  *Id*.  The officer reviewed the driver's licenses and bar cards of Mr. Marshall and Mr. Nusser and then allowed them to enter the Annex 2 to meet inmates without restriction.  *Id*. ¶¶ 12–14.  The officer made no inquiry as to whether Mr. Marshall and Mr. Nusser represented the inmates with whom they were visiting.  *Id*. ¶ 13.

The procedure for entering both the Detention Center and the Annex 2 was swift and routine, and the burden on the time of the guards and staff was negligible.  *Id*. ¶¶ 6, 9–13.  Mr.

Marshall and Mr. Nusser were allowed to navigate the jails without escort, and nobody voiced any concern to them regarding their presence. *Id*. ¶ 14.

**E.     Defendants later denied Mr. Marshall and Mr. Nusser access to speak with inmates inside the Detention Center pursuant to a stated policy.**

On January 31, 2017, Mr. Marshall, Mr. Nusser, and Ryan Fowler, an ACLU-SC legal intern, traveled to the Detention Center for additional meetings with inmates. *Id*. ¶ 15. Like before, Mr. Marshall, Mr. Nusser, and Mr. Fowler gave the officer at the front desk the names of the inmates with whom they wished to speak. *Id*. The officer identified each inmate's location, reviewed the driver's licenses and bar cards of Mr. Marshall and Mr. Nusser, reviewed the driver's license and student identification card of Mr. Fowler, printed name tags for the three men, and allowed them to enter the Detention Center. *Id*. ¶¶ 15–16. The officer made no inquiry as to whether the attorneys represented the inmates with whom they were visiting. *Id*. ¶ 17.

Because the lobby of the Detention Center was undergoing renovations, Mr. Marshall, Mr. Nusser, and Mr. Fowler were not required to pass through a metal detector as had been the case during previous visits. *Id*. ¶¶ 5, 18. A hand-held metal detector wand was sitting on the front desk, but the officer did not use it or any other security device to screen the men. *Id*. ¶ 18. The officer also did not pat them down or in any other way check to see whether they were carrying any items that might cause a security threat. *Id*.

Once inside the Detention Center, Mr. Marshall, Mr. Nusser, and Mr. Fowler met with Officer T. Wilson, who made a copy of their inmate list. *Id*. ¶ 19. At that time, Officer Wilson made no inquiry as to whether the attorneys represented the inmates with whom they were there to speak. *Id*. Officer Wilson arranged to have the first inmate on the list brought to a room in the booking area where Mr. Marshall and Mr. Nusser had met with inmates during previous visits. *Id*.

Approximately five minutes into the meeting, Officer Wilson opened the door and interrupted the conversation. *Id*. ¶ 20. Officer Wilson asked the attorneys about the purpose of their meetings and also asked whether they represented the listed inmates. *Id*. Mr. Marshall and Mr. Nusser explained that they were interviewing inmates in regard to alleged violations of constitutional rights and informed Officer Wilson that they did not represent any of the inmates at that time. *Id*. Officer Wilson told Mr. Marshall, Mr. Nusser, and Mr. Fowler that because they did not represent any of the inmates on their list, they would have to leave the Detention Center. *Id*. ¶ 21. Officer Wilson stated that Spartanburg County has a policy prohibiting attorneys from speaking with inmates the attorneys do not already represent. *Id*.

When Mr. Marshall attempted to discuss the matter further, Officer Wilson said the attorneys would have to speak with Defendant Freeman, the director of the Detention Center. *Id*. ¶ 22. Officer Wilson then escorted Mr. Marshall, Mr. Nusser, and Mr. Fowler out of the booking area, across the facility, and into Major Freeman's office. *Id*. ¶ 23. Major Freeman told them the Detention Center has a policy prohibiting attorneys from speaking with inmates in person unless the attorneys first demonstrate they have a pre-existing attorney-client relationship with those inmates. *Id*. Mr. Marshall informed Major Freeman that Mr. Nusser, Mr. Fowler, and he were all working with the ACLU to investigate matters concerning inmates' constitutional rights and that Mr. Fowler was a legal intern with the ACLU-SC. *Id*. ¶ 24. Mr. Marshall attempted to discuss Defendants' policy with Major Freeman, asserting there was a constitutional right to speak with inmates. *Id*. Major Freeman insisted he would only deviate from the policy at the direction of Sheriff Wright. *Id*. ¶ 25. Until then, he said, Mr. Marshall, Mr. Nusser, and Mr. Fowler were prohibited from speaking with inmates and would have to leave the premises. *Id*.

After the meeting with Major Freeman, Officer Wilson escorted Mr. Marshall, Mr. Nusser, and Mr. Fowler out of the Detention Center. *Id*. ¶ 26.

Because of Defendants' policy, practice, and custom of prohibiting attorneys from visiting inmates they do not already represent, Plaintiffs have been unable to meet and engage in confidential, in-person communications with inmates at the Spartanburg County Detention Center. *Id*. ¶ 27; Choudhury Decl. ¶ 12.

## AUTHORITY AND ARGUMENT

**A.    The Court should grant preliminary injunctive relief allowing Plaintiffs access to speak with inmates inside the Detention Center.**

Preliminary injunctions provide relief to a party seeking to enjoin another from committing an irreparable injury prior to a final determination by a trial on the merits. *See* Fed. R. Civ. P. 65. To secure preliminary injunctive relief, Plaintiffs must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary injunctive relief; (3) that the balance of equities tips in favor of providing preliminary injunctive relief; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As discussed below, Plaintiffs satisfy all four of these elements and are thus entitled to preliminary injunctive relief. Accordingly, after providing Defendants notice and the opportunity to be heard at a hearing, this Court should enter a preliminary injunction prohibiting Defendants from denying Plaintiffs access to speak in person with any inmate housed at the Spartanburg County Detention Center.

**1.    Plaintiffs have established a likelihood of success on the merits.**

A district court "has no discretion to deny relief by preliminary injunction to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right." *Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960); *see also Am. Civil*

9

*Liberties Union Fund of Michigan v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015), *cert. denied sub nom. Livingston Cty., Mich. v. Am. Civil Liberties Union Fund of Michigan*, 136 S. Ct. 1246 (2016) ("[T]he crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits . . . because the public's interest and any potential harm to the parties or others largely depend on the constitutionality of the [government action].") (internal quotations omitted). "While plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, they 'need not show a certainty of success.'" *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)).

For the reasons that follow, Plaintiffs demonstrate that they have a likelihood of success on the merits of their claims.

2. **Plaintiffs have a First Amendment right to speak in person with inmates regarding their legal rights and to recruit inmates for the purpose of challenging unconstitutional practices.**

The United States Supreme Court has long held that the First Amendment's guarantee of the freedom of expression and association protects the right of a non-profit, public interest organization to "solicit prospective litigants . . . for the purpose of furthering the civil-rights objectives of the organization and its members." *In re Primus*, 436 U.S. 412, 423–24 (1978) (discussing *NAACP v. Button*, 371 U.S. 415, 428–30 (1963)). Almost forty years ago, in a case concerning the ACLU-SC, the Supreme Court recognized that an organization's engagement "in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public" falls firmly within the protection of the First Amendment. *In re Primus*, 436 U.S at 431. Indeed, the Court acknowledged that the

10

effectiveness of using litigation to "advance[e] the cause of civil liberties often depends on the ability to make legal assistance available to suitable litigants." *Id*. It also held that the First Amendment "require[s] a measure of protection for advocating lawful means of vindicating legal rights, including advis[ing] another that his legal rights have been infringed and refer[ring] him to a particular attorney or group of attorneys . . . for assistance." *Id*. at 432 (internal citations and quotation marks omitted).

Furthermore, "an attorney must be able to communicate with an inmate in confidence before litigation and before establishment of a formal attorney-client privilege in order to offer legal advice or determine whether an actionable claim exists." *Livingston Cty.*, 796 F.3d at 645. "[T]he right to obtain legal advice . . . applies . . . to legal representation intended to advocate a political or social belief." *Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir. 2000) (citing *Button*, 371 U.S. at 419–20). Inmates similarly have substantive rights under the United States Constitution, including a right to "unimpaired, confidential communication with an attorney [as] an integral component of the judicial process." *Livingston Cty.*, 796 F.3d at 643. This right "is not limited to those already represented by an attorney of record, but extends equally to prisoners seeking any form of legal advice or assistance." *Ruiz v. Estelle*, 503 F. Supp. 1265, 1372 (S.D. Tex. 1980), *aff'd in part, rev'd in part*, 679 F.2d 1115 (5th Cir. 1982), *amended in part, vacated in part*, 688 F.2d 266 (5th Cir. 1982) (citing *Nolan v. Scafati*, 430 F.2d 548 (1st Cir. 1970)).

In accordance with these longstanding precedents, the ACLU and ACLU-SC have a well-established First Amendment right to speak in person to Detention Center inmates to advise them of their constitutional rights and to recruit potential plaintiffs for civil rights lawsuits. Such meetings further the expressive and associational mission of the organizations to protect and defend individual rights and liberties guaranteed by the U.S. Constitution, including the rights

11

and liberties of jail inmates. To this end, the ACLU and ACLU-SC have spent two years investigating and exposing violations of the constitutional rights of indigent defendants with criminal cases in South Carolina summary courts. *See* Price et al., *supra*; *see also* Smith et al., *supra*. The groups have published a report detailing these violations, but there is no indication that the public is adequately aware of the problem or that the identified violations have been adequately addressed. The ACLU and ACLU-SC therefore seek to speak in person and confidentially with indigent people incarcerated in the Detention Center by order of South Carolina summary courts to advise them of their rights, learn of constitutional violations the inmates have suffered, and determine whether the inmates have viable legal claims. *See Livingston Cty.*, 796 F.3d at 645 (recognizing need for confidential attorney-inmate communications "before litigation and before establishment of a formal attorney-client privilege in order to offer legal advice or determine whether an actionable claim exists"). Inmates, however, are unlikely to initiate contact with the ACLU or ACLU-SC because they typically have little-to-no understanding of the types of claims handled by these organizations. This effectively prevents Plaintiffs from establishing a pre-existing representational relationship that complies with Defendants' policy, practice, and custom of permitting attorney visits only when such a relationship exists.

For these reasons, Plaintiffs' efforts to meet in person with Detention Center inmates falls squarely within the core First Amendment protection for organizations seeking to advance civil rights and civil liberties by communicating with potential clients regarding litigation "as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public." *In re Primus* 436 U.S. at 431.

### 3. Plaintiffs will suffer irreparable harm in the absence of preliminary injunctive relief.

The second factor in obtaining preliminary injunctive relief is for the movants to demonstrate they are likely to suffer an irreparable harm absent preliminary injunctive relief. *Winter*, 555 U.S. at 20. The United States Supreme Court has held that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (holding irreparable harm element was satisfied where employer threatened to terminate employees because of their political associations). Indeed, "even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *Livingston Cty.*, 796 F.3d at 649; *see also Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir. 1996) (quoting 11A Charles A. Wright, Arthur R. Miller & Mary Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995) (holding when "an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary")). This is especially true where the plaintiff "cannot be made whole through the imposition of money damages." *See Howard v. United States*, 864 F. Supp. 1019, 1029 (D. Colo. 1994) (citing *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir. 1986) (holding injunction proper where money damages constitute inadequate recompense)).

The Fourth Circuit has held that "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 190–91 (4th Cir. 2013) (internal citations and quotation marks omitted). Therefore, where a plaintiff has demonstrated a likelihood of success on a First Amendment claim, "the Fourth Circuit has generally found irreparable injury [exists]." *Tepeyac v. Montgomery Cty.*, 779 F. Supp. 2d 456, 471 (D. Md. 2011), *aff'd in part, rev'd in part*, 683 F.3d

591 (4th Cir. 2012), *on reh'g en banc sub nom. Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184 (4th Cir. 2013), and *aff'd sub nom. Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184 (4th Cir. 2013) (citing *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)).  Courts in the District of South Carolina have also recently ruled that the deprivation of a constitutional right is sufficient to show irreparable harm in the absence of injunctive relief.  *See Field v. McMaster*, 663 F. Supp. 2d 449, 453 (2009) (holding irreparable harm showing is satisfied where parties demonstrate "they would be deprived of a constitutional right if the court did not grant them injunctive relief").

In this case, Plaintiffs are seeking to exercise a well-established First Amendment right to communicate with inmates in order to further their "civil-rights objectives" and to potentially pursue litigation challenging the violation of civil rights and civil liberties "as a vehicle for effective political expression and association . . . ." *In re Primus* 436 U.S. at 423–24, 431. Defendants have implemented and enforced a policy, practice, and custom that prohibits Plaintiffs from exercising that constitutional right by refusing to allow them to speak with inmates inside the Spartanburg County Detention Center simply because they have no pre-existing attorney-client relationship with the inmates.  Preliminary injunctive relief is especially appropriate here because Defendants' denial of Plaintiffs' constitutional rights creates an irreparable harm that cannot be remedied through the imposition of money damages.  This Court should grant Plaintiffs' request for preliminary injunctive relief because Plaintiffs will suffer irreparable harm in the absence of such relief.

**4.     The balance of equities tips in Plaintiffs' favor as preliminary relief would not substantially injure the government.**

When considering a request for preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or

14

withholding of the requested relief." *Winter*, 555 U.S. at 24. Where a preliminary injunction seeks to enjoin an alleged First Amendment violation, the Fourth Circuit has held that both the "balance of equities" and "public interest" factors under *Winter* will be "established" in the moving party's favor. *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (affirming district court's order of preliminary injunction to enjoin statute alleged to violate First Amendment). Additionally, the government will be "in no way harmed by the issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Id.* (internal quotations omitted).

When the "plaintiff is claiming the loss of a constitutional right, courts commonly rule that even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue." 11A Charles A. Wright, Arthur R. Miller & Mary Kane, Federal Practice and Procedure § 2948.2 (3d ed. 2017); *see also Allen, Allen, Allen & Allen v. Williams*, 254 F. Supp. 2d 614 (E.D. Va. 2003) (granting preliminary injunction to law firm where hardship to firm of initiating disciplinary proceedings outweighed state bar association's interest in disciplinary action over advertisement potentially protected by First Amendment); *Livingston Cty.*, 23 F. Supp. 3d at 843 (granting preliminary injunction to ACLU of Michigan where jail refused to accept and distribute legal mail in denial of ACLU's First Amendment rights); *Farnam v. Walker*, 593 F. Supp. 2d 1000, 1016 (C.D. Ill. 2009) (finding harm that may result from erroneously granting preliminary injunction regarding prisoner's Eighth Amendment claim was slight compared to potential harm from erroneously denying it). Courts have further ruled that where an inmate's First Amendment right is in jeopardy, the balance of equities tips in favor of the inmate if allowing the exercise of the right "will have a *de minimis* impact" on the prison's

15

budget, and security will not be adversely impacted. *Beerheide v. Zavaras,* 997 F. Supp. 1405, 1411 (D. Colo. 1998) (granting preliminary injunction to inmates of Orthodox Jewish faith where prison's denial of kosher meals violated their constitutional right to free exercise).

Plaintiffs' First Amendment right to speak with inmates inside the Detention Center outweighs any hardship—including financial burdens—that preliminary injunctive relief would cause Defendants. The Detention Center already has a well-defined, efficient mechanism for allowing attorneys into the facilities to speak to inmates whom they represent. Plaintiffs' entry into the facility will be no different than these routine meetings, which take place inside one of a number of vacant rooms designated for attorneys to meet with inmates and do not require the time or resources of guards or other staff members. On the other hand, the hardship placed on Plaintiffs by Defendants' denial of their constitutional rights is clear. Without the ability to speak in person with inmates to inform them of their constitutional rights and assess their circumstances, Plaintiffs cannot exercise their well-established First Amendment right to "make legal assistance available to suitable litigants" and change unconstitutional policies through effective litigation. *In re Primus*, 436 U.S. at 431.

This Court should grant Plaintiffs' request for preliminary injunctive relief because the hardship created by denying Plaintiffs' constitutional rights outweighs any negligible effect Plaintiffs' presence inside the Detention Center may have on Defendants' resources, financial or otherwise.

### 5. The public interest would be furthered by prohibiting Defendants from denying Plaintiffs access to speak in person with Detention Center inmates.

The Fourth Circuit has held that where an alleged First Amendment violation is the subject of a preliminary injunction, "upholding constitutional rights surely serves the public interest." *Giovani Carandola*, 303 F.3d at 521 (citation omitted); *see also Newsom*, 354 F.3d at

16

261 ("[W]e believe that the public interest is better served by following binding Supreme Court precedent and protecting the core First Amendment right of political expression.") (internal citation omitted).  Moreover, "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Miller*, 622 F.3d at 540 (internal quotations omitted). Indeed, "the public as a whole has a significant interest in ensuring . . . protection of First Amendment liberties." *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) (granting preliminary injunction to halt enforcement of portions of state statutes "that are of questionable constitutionality").

Almost four decades have passed since the United States Supreme Court recognized that the First Amendment affords non-profit organizations like the Plaintiffs a right to further their expressive and associational mission to inform people of their constitutional rights, change unconstitutional polices through litigation and other means, improve conditions for disadvantaged persons, and further the cause of social justice. *See In re Primus*, 436 U.S. 412. Plaintiffs seek to exercise precisely this right by speaking in person with Detention Center inmates.  These visits are integral to Plaintiffs' ability to inform Detention Center inmates of their civil rights and civil liberties, and to investigate and ultimately challenge the violation of constitutional rights of indigent people jailed following prosecution in South Carolina summary courts—an issue that Plaintiffs have already identified as one of serious public concern. Defendants' enforcement of a policy, practice, and custom denying Plaintiffs access to speak with inmates inside the Detention Center deprives Plaintiffs of their core First Amendment rights.  Prohibiting Defendants from continuing to do so is in the best interest of the public. Accordingly, this Court should grant preliminary injunctive relief.

**CONCLUSION**

As part of their mission to advance civil rights and civil liberties, the ACLU and ACLU-SC are investigating constitutional violations occurring in South Carolina summary courts and seek to challenge the policies and practices that cause such violations.  In an exercise of their core First Amendment rights to expression and association, the organizations seek to speak in person with indigent people incarcerated in the Spartanburg County Detention Center to advise them of their rights, learn of constitutional violations they have suffered, and determine whether they have viable legal claims.  Defendants are enforcing a policy, practice, and custom that arbitrarily and unconstitutionally denies Plaintiffs these First Amendment freedoms.

Because Plaintiffs have established a likelihood of success on the merits and will suffer irreparable harm without immediate injunctive relief, Plaintiffs respectfully ask this Court to enter a preliminary injunction enjoining Defendants' policy, practice, and custom of prohibiting Plaintiffs from speaking in person with inmates incarcerated in the Spartanburg County Detention Center.

Respectfully submitted,

**WYCHE, P.A.**

s/Rita Bolt Barker
Rita Bolt Barker (D.S.C. I.D. No. 10566)
Troy A. Tessier (D.S.C. I.D. No. 6863)
Marshall Winn (D.S.C. I.D. No. 529)
44 East Camperdown Way
Greenville, S.C. 29601
Telephone: 864-242-8200
Telecopier: 864-235-8900
rbarker@wyche.com; ttessier@wyche.com
mwinn@wyche.com

**ATTORNEYS FOR PLAINTIFFS**

Dated:  May 3, 2017