IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTH CAROLINA,<br><br>    Plaintiffs<br>v.<br><br>SPARTANBURG COUNTY; CHUCK WRIGHT, in his official capacity as the Spartanburg County Sheriff; and ALLEN FREEMAN, in his official capacity as administrator of the Spartanburg Detention Center,<br><br>    Defendants. | Case No. 7:17-cv-01145-TMC<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiffs file this reply in further support of their Motion for Preliminary Injunction in this case (Dkt # 5). This case concerns a jail policy that infringes on the established First Amendment rights of Plaintiffs American Civil Liberties Union Foundation ("ACLU") and American Civil Liberties Union Foundation of South Carolina ("ACLU-SC") to educate inmates about their legal rights and to solicit prospective litigants to advance the organizations' civil rights and liberties mission. By prohibiting Plaintiffs from speaking in person with Spartanburg County Detention Center ("Detention Center") inmates whom they do not yet represent, Defendants prevent Plaintiffs from engaging in expressive and associational activities critical to the development of litigation challenging the unlawful incarceration of indigent people.

This Court must apply the well-established strict scrutiny standard for analyzing First Amendment claims by non-profit civil rights organizations. It should reject Defendants' incorrect

insistence on evaluating Defendants' policy through the test set forth in *Turner v. Safely*, 482 U.S. 78 (1987), because that test applies solely to prisoners' constitutional claims.

Nevertheless, Defendants' policy fails to satisfy either strict scrutiny or the less stringent *Turner* standard. The record shows that Defendants selectively apply their policy to Plaintiffs while routinely permitting other attorneys and non-attorneys to visit in person with inmates whom they do not represent. Nor have Defendants shown that the occasions when Plaintiffs did speak in person with inmates harmed jail security or unreasonably burdened administrative resources. For these reasons and those set forth below, this Court should grant Plaintiffs' request for a preliminary injunction.

## AUTHORITY AND ARGUMENT

**A.     The test set forth in *Turner v. Safley* does not apply to this case.**

1. This Court must apply strict scrutiny to evaluate Defendants' policy.

There can be no serious dispute that the challenged policy infringes on Plaintiffs' First Amendment rights to educate jail inmates about their legal rights and to solicit prospective civil rights litigants. This Court must apply the strict scrutiny standard for analyzing First Amendment claims by civil rights organizations set forth in *NAACP v. Button*, 371 U.S. 415, 432-44 (1963), and *In re Primus*, 436 U.S. 412, 423–24 (1978). Defendants' contention that the *Turner* test applies should be rejected because that test governs only prisoners' constitutional claims.

Plaintiffs' request for visitation with Detention Center inmates is part of their effort to inform people about their legal rights, to determine whether they were unlawfully incarcerated, and to discuss potential legal representation. Dkt. # 5 at 3–4; Dkt. #5-3 ¶¶ 2, 24; Declaration of

2

Susan K. Dunn ("Dunn Decl.") ¶ 3[1]. Plaintiffs' ability to "advis[e] another that his legal rights have been infringed" and to "solicit . . . prospective litigants" falls squarely within the First Amendment right "to engage in association for the advancement of beliefs and ideas." *In re Primus*, 436 U.S. at 423–24.

Recent events in South Carolina underscore the vital importance of such First Amendment protected activity. For more than two years, the ACLU and the ACLU-SC have been investigating and exposing systemic violations of the constitutional rights of indigent defendants in South Carolina's summary courts. *See* Dkt. # 5 at 2–3. Indeed, after meeting with numerous unrepresented inmates in the Lexington County Detention Center—precisely the sort of meetings sought in this case—Plaintiffs filed a class action lawsuit on behalf of five indigent people who are challenging their unlawful incarceration under the U.S. Constitution. *See* Complaint, *Brown v. Lexington Cnty., South Carolina*, Case No. 3:17-cv-01426-MBS-SVH (D.S.C. June 1, 2017). Notably, Plaintiffs were permitted to speak in-person with these inmates despite the absence of a preexisting representational relationship. Supplemental Declaration of Nusrat J. Choudhury ("Supp. Choudhury Decl.") ¶ 6–7[2]. The meetings were critical to the development of the lawsuit, which furthers Plaintiffs' mission to advance civil liberties. *Id*.

Plaintiffs' First Amendment challenge to a policy prohibiting the type of in-person meetings necessary to filing *Brown v. Lexington County* must be evaluated under the "exacting scrutiny applicable to limitations on core First Amendment rights . . . ." *In re Primus*, 436 U.S. at 432. This strict scrutiny standard requires Defendants to show the challenged regulation furthers a "compelling" state interest and is "closely drawn" to achieve that interest. *See id*.;

---

[1] Declaration of Susan Dunn is attached hereto as Exhibit 1.
[2] Supplemental Declaration of Nusrat Choudhury is attached hereto as Exhibit 2.

*Button*, 371 U.S. at 433, 444 ("only a compelling state interest . . . can justify limiting First Amendment freedom").[3]

In contrast, the less stringent *Turner* standard applies to challenges against regulations that violate the constitutional rights of <u>prisoners</u>. In establishing a standard of review for such claims, the Supreme Court explicitly declined to adopt the higher standard applied to prison regulations that violate <u>non-prisoners'</u> rights. *See Turner*, 482 U.S. at 86.[4] The Third Circuit explicitly recognized this distinction when evaluating an attorney's First Amendment challenge to prison directives that, among other things, precluded her from speaking to inmates for whom she did not have a visitation permit. *Sturm v. Clark*, 835 F.2d 1009, 1010, 1013 (3d Cir. 1987). It held that "[a]lthough plaintiff's claim is made in the context of a penal ambience, we must evaluate it in light of <u>conventional first amendment doctrine</u>, and not in light of the less demanding standard involving only prisoners' rights." *Id*. at 1014 (emphasis added). The Court reasoned that while "the very fact of prisoners' incarceration necessarily implies that they pose a risk," attorney visits "ordinarily do not implicate a prison's interest in deterring crime, in encouraging rehabilitation, or in ensuring institutional security." *Id*.

This Court should therefore apply strict scrutiny to Defendants' policy.

---

[3] Although the Supreme Court did not explicitly use the term "strict scrutiny" when it decided *NAACP v. Button*, 371 U.S. 415 (1963), or *In re Primus*, 436 U.S. 412, the Supreme Court and federal appellate courts have made clear that those decisions rested on the application of strict scrutiny. *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2229 (2015); *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Depts., Appellate Div. of the Supreme Court of N.Y.*, 852 F.3d 178, 191 (2d Cir. 2017); *Wollschlaeger v. Governor, Florida*, 848 F.3d 1293, 1310 (11th Cir. 2017).

[4] The Supreme Court acknowledged in *Turner* that its earlier decision in *Procunier v. Martinez*, 416 U.S. 396 (1974), had "expressly reserved the question of the proper standard of review to apply in cases involving questions of prisoners' rights." *Turner*, 482 U.S. at 85 (citing *Martinez*) (internal marks and citations omitted).

> 2. <u>Defendants' policy does not further a compelling governmental interest and is not narrowly tailored</u>.

The Detention Center's policy of prohibiting Plaintiffs' attorneys from meeting with inmates whom they do not already represent fails to meet strict scrutiny for two reasons.

First, Defendants fail to articulate any compelling governmental interest that would be harmed by permitting such meetings, much less show that the challenged policy is narrowly tailored to advance such interests. Instead, Defendants argue generally that permitting Plaintiffs' attorneys and staff to meet in-person with inmates absent a preexisting representational relationship would impair "the limitation of visitors to the Detention Facility." Dkt. # 28 at 8–9. Defendants' general desire to limit jail visitation is not, however, a compelling governmental interest. Nor does this desire, without further elaboration and evidentiary support, involve government interests in promoting jail security or limiting the expenditure of administrative resources. Simply put, in this context, attorney visits with inmates "do not implicate a prison's interest . . . in ensuring institutional security." *Sturm*, 835 F.2d at 1010.

Second, Defendants fail to show that their policy is narrowly tailored to advance any compelling governmental interests in jail security or the preservation of administrative resources. Defendants do not substantiate their vague suggestion that granting Plaintiffs the requested meetings would somehow "cause disparate access to visitation privileges by inmates and create possible security issues . . . ." Dkt. # 28 at 9. Nor do Defendants show these meetings would require any security protocols other than procedures already well-established for screening attorneys for legal visits and escorting inmates to and from attorney visiting rooms.

Rather, Defendants generally invoke the importance of jail security and the preservation of administrative resources without showing with specificity that permitting Plaintiffs to interview inmates absent a preexisting representational relationship would compromise either

5

interest.  *See* Dkt. # 28 at 8–9; Freeman Decl. ¶ 8.  Indeed, as discussed in detail below, Defendants permitted Plaintiffs' attorneys to meet with unrepresented inmates over the course of two days in December 2016, yet no purported compelling governmental interests in security or the preservation of resources were hampered.  *See* Dkt. # 5-3 Marshall Decl. ¶¶ 3–14; Supplemental Declaration of Toby J. Marshall ("Supp. Marshall Decl."). ¶¶ 3–9[5].  These facts squarely contradict Defendants' blanket assertions to the contrary.  *See* Freeman Decl. ¶¶ 7–8.

Moreover, it appears that Defendants' purportedly neutral policy is in fact a content-based restriction of speech.  Defendants routinely allow private attorneys and staff of the Seventh Judicial Circuit Public Defender's Office to meet in-person with unrepresented inmates.  *See* Declaration of Clay Allen ("Allen Decl.") ¶ 9[6]; *See* Declaration of Ricky Harris ("Harris Decl.") ¶¶ 2–6[7].  Defendants' selective application of their policy against only civil rights organizations fails to satisfy strict scrutiny.  *See, e.g.*, *Sturm*, 835 F.2d at 1015 (applying restrictions speech restriction only to plaintiff "leads ineluctably to the conclusion that the defendants sought to regulate the content of speech, not the manner in which it occurred").

Defendants' attempt to justify a prohibition on Plaintiffs' rights to expression and association through in-person meetings with inmates they do not represent fails to meet the "exacting scrutiny" standard applied to First Amendment claims.  *In re Primus*, 436 U.S. at 432.

**B.     Even if the *Turner* test were applicable, it would support Plaintiffs.**

A prison regulation that impinges on a prisoner's constitutional right is valid only if it is "reasonably related to legitimate penological interests."  *Turner,* 482 U.S. at 89. The parties do not dispute the four prongs of the *Turner* test.  *See* Dkt. #28 at 6.  As set forth above, the *Turner*

---

[5] Supplemental Declaration of Toby Marshall is attached hereto as Exhibit 3.
[6] Declaration of Clay Allen is attached hereto as Exhibit 4.
[7] Declaration of Ricky Harris is attached hereto as Exhibit 5.

6

test is inapplicable in a case brought to vindicate the First Amendment rights of civil rights organizations. Nonetheless, even if the test were applicable, it would support Plaintiffs.

    1.    <u>The challenged policy fails under the first prong of the *Turner* test, and no additional analysis is necessary</u>.

If there is no "'valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it'. . . the policy is unconstitutional and 'the other factors do not matter.'" *Am. Civil Liberties Union Fund of Michigan v. Livingston Cty.*, 796 F.3d 636, 646 (6th Cir. 2015) (quoting *Muhammad v. Pitcher*, 35 F.3d 1081, 1084 (6th Cir. 1994)).

    *a. Defendants have failed to identify a legitimate, neutral objective their policy was designed to meet.*

The Fourth Circuit has identified three penological objectives in the operation of a jail: preserving order, preserving discipline, and maintaining institutional security. *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 469 (4th Cir. 1999); *see also Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006) (recognizing state's interests in maintaining prison order, discipline, and security). Additionally, Defendants have failed to specify any of these interests as a reason for denying Plaintiffs the ability to communicate in-person with unrepresented inmates. Instead, Defendants have simply asserted in conclusory fashion that "the limitation of visitors to the Detention Facility is of clear, if not preeminent importance, in running a jail." Dkt. # 28 at 8. But the generic "limitation of visitors" is not a legitimate governmental objective; rather, it is the policy being challenged. Defendants have offered no objectives that would justify the challenged policy.

For these reasons alone, Defendants fail to satisfy the first prong of the *Turner* test.

> *b. The challenged policy is not rationally related to any legitimate, neutral governmental objective.*

Even if Defendants had advanced a legitimate penological objective in support of the challenged policy, "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Hayer v. U.S. Bureau of Prisons,* 849 F.3d 202, 215 (4th Cir. 2017) (quoting *Turner,* 482 U.S. at 89–90). That is the case here, as Defendants have failed to explain how allowing Plaintiffs to meet in-person with inmates would jeopardize Defendants' ability to maintain order, impose discipline, or ensure security. For example, Defendants have not identified a single instance in which allowing Plaintiffs—or any other attorneys—to conduct interviews at the Detention Center has disrupted the orderly incarceration of inmates. Likewise, Defendants have not identified a single instance in which such interviews resulted in disciplinary problems.

Furthermore, the record demonstrates that Defendants fail to apply the challenged policy in a neutral manner. Defendants admittedly treat attorneys who have preexisting relationships with inmates differently from those who lack such relationships. Dkt. # 28 at 1 (acknowledging Defendants' "policy and practice of requiring attorneys to have an existing attorney-client relationship . . . to have a face-to-face meeting with an inmate"). Defendants selectively apply this policy to Plaintiffs, while allowing others—including private lawyers and staff of the Seventh Judicial Circuit Public Defender's office—to conduct in-person, inmate meetings despite the lack of an attorney-client relationship. Allen Decl. ¶¶ 4–9 (Ex 4); Harris Decl. ¶¶ 2–7 (Ex 5). Defendants also fail to consistently enforce the challenged policy, as demonstrated by the fact that Plaintiffs' cooperating attorneys were allowed on three occasions to interview inmates with whom they had no relationship, and the Seventh Judicial Circuit Public Defender was only once denied a visit with a new inmate on the grounds that his office did not represent

8

that person. Dkt. # 5–3 ¶¶ 3–12; Allen Dec. ¶ 9 (Ex 4).  The fact that Defendants fail to apply their policy in a neutral manner shows it is not rationally related to a legitimate interest.

In other parts of their brief, Defendants have made general and abstract claims about "possible security issues" caused by allowing Plaintiffs the meetings they seek. Dkt. # 28 at 9. But Defendants do not explain how visitation by only certain licensed attorneys, or legal interns and paralegals working under the supervision of a licensed attorney, creates a specific threat to the security of inmates, guards, or the facility at large while visitation by other attorneys poses no such threat.  Indeed, such a suggestion is wholly without merit, as many attorneys will enter the facility to meet both inmates with whom they have a preexisting relationship <u>and</u> inmates with whom there is no relationship.  Allen Decl. ¶¶ 4–9 (Ex 4); Harris Decl. ¶¶ 2–3 (Ex 5).

Courts have held that "[b]ecause an attorney is considered an officer of the court, there is no reason to suspect that he or she would be a threat to prison security or discipline." *State v. Walker*, 804 N.W.2d 284, 294 (Iowa 2011) (quoting 72 C.J.S. *Prisons* § 113, at 570–71 (2005)). Indeed, it is widely recognized that all attorneys are in a "special position" when it comes to inmate access, one "based not only on [a] representational obligation with the prison inmate's right of access to the courts, but also upon the fact that the legal profession has an historic role in the administration of justice." *State ex rel. McCamic v. McCoy*, 276 S.E.2d 534, 536 (W. Va. 1981).  Simply put, "lawyers are officers of the court as they assist the courts 'in the discharge of the vital duties of the administration of law and the resolving of legal controversies.'" *Id.* (quoting *In re Eary*, 58 S.E.2d 647, 650 (W. Va. 1950)).

Defendants' policies reinforce these principles and demonstrate an implicit acknowledgment that licensed attorneys, as well as legal interns and paralegals working under their supervision, do not pose a significant risk to security or the disruption of order or discipline.

9

According to Defendants' visitation policy, for example, "Social Visitors" such as friends and family members have explicit restrictions and requirements placed on them that do not apply to "Professional Visitors" like attorneys and paralegals. Dkt. # 28-1 at 6-9. These include restrictions and requirements related to scheduling; number of visitors; frequency of visits; possession of cameras, tobacco products, lighters, weapons, and other contraband; pat-downs and strip searches; conduct at the facility; dress; and visitation privileges. *Id.* at 7.

Attorneys and paralegals, on the other hand, are allowed to visit inmates "any day during the week during normal working hours" and may even visit before and after normal working hours upon authorization. *Id.* Likewise, they must meet only two explicit requirements to access the facility: they must (1) present a valid identification card and credentials identifying them as a professional visitor; and (2) consent to visual search of their briefcase or handbag. *Id.* at 7–8.

Defendants' security practices further reinforce their acknowledgment that attorneys, legal interns, and paralegals pose no real threat to security, order, or discipline. For example, attorneys and a legal intern assisting Plaintiffs entered the Detention Center facilities on four separate occasions, and guards at the front desks never inspected their files or subjected them to pat-downs to ensure they were not carrying contraband. *See* Dkt. # 5–3 ¶¶ 4–6, 8–9, 12–13, 15–18. Rather, the guards merely asked to see their driver's licenses and state bar or student ID registration cards. *Id.* After taking a cursory glance at each, the guard issued name tags and allowed the attorneys to enter the secured booking area. *Id.* On one occasion, the guard failed to subject the attorneys to any sort of metal detection equipment. *Id.* ¶¶ 16–18. Once inside, the attorneys were allowed to travel freely without escort and to meet with inmates. *Id.* ¶¶ 11, 14.

The freedoms Defendants afford to attorneys and paralegals are far greater than those afforded to members of the general public, demonstrating that licensed attorneys—absent any

10

other qualification—pose no viable threat to Defendants' ability to maintain security, order, and discipline.  In sum, there is no valid, rational connection between the challenged policy and any legitimate governmental objective Defendants may have.  Rather, Defendants are restricting Plaintiffs' First Amendment rights based solely on an arbitrary and irrational distinction: the existence of a preexisting attorney-client relationship.  This alone is a sufficient basis for the Court to grant preliminary injunctive relief as requested.  *See Livingston Cty.*, 796 F.3d at 646 (where valid, rational connection is lacking, "other factors do not matter").

2. <u>The challenged policy fails the remaining three prongs of the *Turner* test</u>.

Though it is unnecessary for the Court to do so, a review of the other three *Turner* factors further demonstrates that Defendants' policy is unreasonable.

   *a.   There are no reasonable alternatives for the exercise of Plaintiffs' First Amendment rights.*

The second *Turner* factor examines "whether there are alternative means of exercising the right" being infringed.  482 U.S. at 90.  Defendants argue the "legal mail system" is a viable alternative for Plaintiffs to converse with Detention Center inmates.  Dkt. # 28 at 9.  But in making this assertion, Defendants ignore the necessity of face-to-face meetings for informing inmates of their legal rights, gathering information from them, determining whether actionable claims exist, and advancing civil liberties through the vehicle of litigation in a timely manner.

"The opportunity to communicate privately with an attorney is an important part of [an inmate's] meaningful access [to the courts]."  *Ching v. Lewis*, 895 F.2d 608, 609 (9th Cir. 1990).  In *Ching*, the Ninth Circuit found a policy limiting attorney communications to mail or telephone prohibits "effective" communications and thus "unnecessarily abridges the prisoner's right to meaningful access to the courts."  *Id*. at 609–10.  Thus, the Court concluded that "a prisoner's right of access to the courts includes contact visitation with [legal] counsel."  *Id*. at 610.

11

Communications are by definition a two-way street, and the principles outlined in *Ching* apply equally to attorneys who attempt to meaningfully connect with incarcerated persons to inform them of their legal rights and to determine in a timely manner whether they have actionable claims. Written correspondence is insufficient for effectively assessing an inmate's situation, identifying constitutional rights violations, and determining the timing and availability of legal remedies. In-person interviews allow for dialogue that provides both inmates and attorneys the ability to immediately ask questions, obtain clarifications, assess credibility, develop trust, and much more. Supp. Choudhury Decl. ¶ 7 (Ex 2); *see also* Dunn Decl. ¶ 3 (Ex 1).

Moreover, it appears that even Defendants fail to see mail as a viable alternative to in-person communications. Defendants routinely allow attorneys to enter the Detention Center and speak to inmates with whom the attorneys have no preexisting attorney-client relationship, rather than restricting their communications to legal mail. Allen Decl. ¶¶ 4–9 (Ex 4); Harris Decl. ¶¶ 2–6 (Ex 5).

For these reasons, Defendants' policy fails under the second *Turner* factor.

> b.  *Allowing Plaintiffs to speak with inmates in person does not substantially impact guards, other inmates, or the general allocation of Detention Center resources.*

Under the third *Turner* factor, the Court must consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." 482 U.S. at 90. Defendants maintain that allowing Plaintiffs to visit with inmates "would burden Detention facility staffing and potentially cause disruption amongst other inmates," but Defendants fail to provide supporting evidence. Dkt. # 28 at 9. Defendants do not identify any instances in which disruptions occurred as a result of attorneys meeting with inmates despite the lack of a preexisting relationship. Defendants likewise fail to identify any

instances in which attorneys burdened guards or other prison resources. In short, meetings between attorneys and inmates occur in the Detention Center on a daily basis without issue.

Defendants appear to contend that "had "[Plaintiffs'] visit[s] been conducted pursuant to Detention Center policy and practice, [f]acility staff would have been more involved for the protection of the visitors, prisoners, and to prevent the introduction of contraband." Dkt. # 28 at 9. These assertions are baseless. The attorneys working with Plaintiffs are professional, licensed lawyers, and there are no grounds for even suggesting that they or the staff they supervise would ever introduce contraband or threaten others present in the Detention Center.

Finally, Defendants fail to explain how a discontinuance of their policy would create an impermissible burden on guards or other jail resources. Defendant Freeman asserts that at least one deputy must escort an inmate from place to place within the facility for meetings with attorneys. Dkt. # 28–2 ¶ 8. He fails to mention, however, that transportation is unnecessary for most inmates to meet with Plaintiffs. In fact, most inmates that Plaintiffs' attorneys interviewed in Defendants' facilities remained in their own housing unit or met with the attorneys in a room adjacent to that unit. Supp. Marshall Decl. ¶ 7 (Ex 3). Not once during these interviews did a guard stand outside the meeting room as Defendant Freeman suggests. *Id*. ¶¶ 7–9.

While it is true that women were transported to the booking area, in all but one instance a guard brought four or five inmates at a time and had them sit outside the meeting room until called in for an interview. Supp. Marshall Decl. ¶¶ 8–9 (Ex 3). Most of these interviews took place inside a room immediately adjacent to an office in which guards were working. *Id*. At no time, however, was an additional guard observed watching over the inmates waiting to be interviewed. *Id*. Plaintiffs' attorneys also interviewed four to six female inmates inside the Detention Center courtroom, which is farther away than the initial meeting room from the

13

nearest occupied office. *Id*. During these interviews, female inmates waiting to be interviewed sat in chairs immediately outside the courtroom. *Id*. At no time during these interviews was a guard observed to be in close proximity to watch over the inmates in interviews or waiting to be interviewed. *Id*.

For these reasons, the challenged policy fails the third prong of the *Turner* test.

    c. *Defendants have ready alternatives to the challenged policy.*

The final *Turner* factor is whether the rights at issue can be fully accommodated with "*de minimis* cost to valid penological interests." 482 U.S. at 90. "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to [jail] concerns." *Heyer,* 849 F.3d at 217 (quoting *Turner*, 482 U.S. at 90).

Defendants address the final *Turner* factor in a cursory fashion, concluding the policy is justified simply because they believe Plaintiffs seek to "cast aside the prison doors and have dozens of prisoners brought to them, possibly against the prisoner's will . . . ." Dkt. # 28 at 9. Nothing could be further from the truth. In reality, Plaintiffs are merely asking that Defendants treat them in the same way they treat attorneys who are permitted to speak in person with inmates whom they do not yet represent, and attorneys who have preexisting attorney-client relationships with inmates.[8] *See* Allen Decl. ¶¶ 4–9 (Ex 4); Harris Decl. ¶¶ 2–6 (Ex 5).

Any concerns regarding safety, security, or other penological interests can be adequately addressed by the procedures Defendants have already established for attorneys and paralegals who meet daily with inmates. There is no dispute that Plaintiffs' cooperating attorneys, legal interns and paralegals intend to comply with the security requirements for professional visits.

---

[8] No inmate is forced to speak with Plaintiffs' cooperating attorneys or their staff. Supp. Marshall Decl. ¶ 10. Before beginning any interview, Plaintiffs' attorneys identify themselves to the inmate, explain the purpose of the visit, and inform the inmate there is no obligation to speak with them and the inmate is free to go at any time. *Id.*

14

Defendants' refusal to allow Plaintiffs to engage in face-to-face communications with inmates is an exaggerated response that is not reasonably related to legitimate concerns.

### C.     **Plaintiffs will suffer actual and imminent harm absent a preliminary injunction.**

The record shows that Defendants' policy prohibits Plaintiffs from engaging in speech and meetings critical to the exercise of the First Amendment right to "engage in association for the advancement of beliefs and ideas." *In re Primus*, 436 U.S. at 423–24.  Defendants' assertions to the contrary fail to address the rights at issue or the critical importance of in-person meetings with inmates for the advancement of Plaintiffs' civil rights mission. *See* Dkt. # 28 at 12.  Because Plaintiffs have shown that Defendants' policy fails to satisfy either strict scrutiny or the *Turner* standard, they have demonstrated irreparable harm absent injunctive relief.  *See Field v. McMaster*, 663 F. Supp. 2d 449. 453 (D.S.C. 2009); Dkt #5 at 13.

### D.     **The balance of equities tip in favor of Plaintiffs.**

Plaintiffs have demonstrated that Defendants' policy prohibits confidential in-person legal visits that are vital to their ability to exercise First Amendment rights.  Thus, the balance of equities and public interest factors weigh in Plaintiffs favor.  *See Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1490 (6th Cir. 1995).

### **CONCLUSION**

Because Plaintiffs have established a likelihood of success on the merits and will suffer irreparable harm without immediate injunctive relief, Plaintiffs respectfully ask this Court to enter a preliminary injunction enjoining Defendants' policy.

*Signature on next page*

15

        Respectfully submitted,

        <u>s/ Troy A. Tessier</u>
        Marshall Winn (Fed. I.D. No. 529)
        Troy A. Tessier (Fed. I.D. No. 6863)
        Rita Bolt Barker (Fed. I.D. No. 10566)
        WYCHE, P.A.
        44 E. Camperdown Way
        Post Office Box 728
        Greenville, SC  29602-0728
        Telephone:  864-242-8200
        Telecopier:  864-235-8900
        E-Mail:      mwinn@wyche.com;
        ttessier@wyche.com;  rbarker@wyche.com

Dated: June 16, 2017        **ATTORNEYS FOR PLAINTIFFS**