IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| American Civil Liberties Union Foundation, | ) | |
| American Civil Liberties Union Foundation of | ) | |
| South Carolina, | ) | |
| | ) | C/A No. 7:17-cv-01145-TMC |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| | ) | |
| Spartanburg County; Chuck Wright, in his | ) | |
| official capacity as the Spartanburg County | ) | |
| Sheriff; and Allen Freeman, in his official | ) | |
| capacity as administrator of the Spartanburg | ) | |
| County Detention Center, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on Plaintiffs' motion for a preliminary injunction (ECF No. 5). Plaintiffs seek relief pursuant to Title 42, United States Code, Section 1983. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(d) (D.S.C.), the motion was referred to a magistrate judge. The magistrate judge filed a Report and Recommendation (the "Report") (ECF No. 33) recommending that this court deny Plaintiff's motion for a preliminary injunction. Plaintiff filed objections to the Report. (ECF No. 38).

The Report has no presumptive weight, and the responsibility to make a final determination in this matter remains with this court. *See Matthews v. Weber*, 423 U.S. 261, 270–71 (1976). In making that determination, the court is charged with conducting a de novo review of those portions of the Report to which either party specifically objects. *See* 28 U.S.C. § 636(b)(1). Then, the court may accept, reject, or modify the Report or recommit the matter to the magistrate judge. *See id.*

1

However, the court need not conduct a de novo review when a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). In that case, the court reviews the Report only for clear error. *See Diamond v. Colonial Life and Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005).

## FACTS AND PROCEDURAL HISTORY

On December 1, 2016, Nusrat J. Choudhury, a senior staff attorney with the American Civil Liberties Union Foundation ("ACLU"),[1] contacted Major Neal Urch, the outgoing director of the Spartanburg County Detention Facility ("SCDF"), to request permission for attorneys working with the ACLU to come to SCDF to conduct inmate interviews. (ECF No. 5-1). Major Urch redirected Ms. Choudhury to Defendant Freeman, who was taking over as administrator of SCDF. *Id.* Plaintiffs allege that an attorney associated with their organization contacted Defendant Freeman on December 2, 2016, by leaving a voicemail on his office phone and by sending him an email. *Id.* at 4. In these messages, Plaintiffs requested permission for two ACLU attorneys to meet with twenty-seven SCDF inmates during specific dates and times over a four-day period. *Id.* Plaintiffs contend that the purpose of these interviews was to investigate the alleged violations of the constitutional rights of inmates currently detained in SCDF. *Id.* Defendant Freeman responded by email to Plaintiffs. *Id.* at 5. He instructed Plaintiffs that "[t]he only visit allowed would be those of Attorneys th[at] represent Inmates" and asked if any of the ACLU attorneys represented any of the inmates listed in the request. *Id.*

Ms. Choudhury subsequently sent a demand letter to Defendant Freeman, again requesting permission to meet with SCDF inmates and alerting Defendant Freeman that SCDF's policy

---

[1] The term "ACLU" will collectively refer to both Plaintiffs throughout this order.

limiting visits with inmates to "attorneys already representing the inmates in criminal, civil, or family court proceedings" was unconstitutional. *Id.* After Defendant Freeman did not respond to the letter, Ms. Choudhury forwarded the letter to Defendant Wright, the Spartanburg County Sheriff. *Id.* Later that day, Defendant Wright emailed Ms. Choudhury and denied her request. *Id.* On both December 12 and December 13, 2016, three ACLU attorneys visited SCDF in order to interview inmates, despite the denial of their request. *Id.* at 6. Each attorney showed the officer at the front desk his driver's license and Bar card in addition to the list of inmates he was there to interview. *Id.* The officer told the attorneys where each inmate was located – either at the main facility or at Annex 2, an off-site facility. *Id.* All three attorneys met with inmates at the main facility, and then two of them met with inmates at Annex 2. *Id.* According to Plaintiffs, at no time did the officer ask these attorneys if they represented the inmates with whom they were meeting. *Id.*

On January 31, 2017, two ACLU attorneys and one ACLU intern went to SCDF to interview inmates. *Id.* at 7. They provided the officer at the front desk with a list of inmates with whom they wished to speak, and the officer identified each inmate's location. *Id.* The attorneys provided the officer with their driver licenses and Bar cards, and the intern gave the officer his student ID badge. *Id.* According to Plaintiffs, the officer did not ask whether the attorneys represented the inmates that they were visiting. *Id.* Because the facility was under construction, the ACLU representatives were not required to go through a metal detector as they had done on previous visits. *Id.* An officer arranged for the first inmate on the list to be brought to a room in the booking area so that the attorneys could meet with him. *Id.* However, shortly after the meeting began, this officer came into the room and asked whether the attorneys represented the inmates with whom they were meeting. *Id.* at 8. The attorneys explained why they were interviewing the

inmates and stated that they did not represent any of the inmates at the facility. *Id.* The officer

then told the attorneys that because they did not represent the inmates, they would have to leave.

*Id.*

The officer subsequently escorted the attorneys to Defendant Freeman's office so that they

could speak with Defendant Freeman about the policy. *Id.* Defendant Freeman told them that

SCDF had a policy prohibiting attorneys from speaking with inmates in person unless the attorneys

could demonstrate that they have a prior attorney-client relationship with the inmates. *Id.*

In support of their reply to Defendants' response in opposition to the motion for

preliminary injunction, Plaintiffs submitted the declaration of Clay Allen, the Public Defender for

the Seventh Judicial Circuit. (ECF No. 31-4). In his declaration, Mr. Allen stated that part of the

job of his office is to determine if eligible inmates facing charges in General Sessions court desire

to have an appointed attorney to represent them in their criminal cases. *Id.* He further stated that

he and his staff are routinely granted professional visits with new inmates in SCDF despite not

having a pre-existing attorney-client relationship with them. *Id.* Furthermore, Mr. Allen described

how he and his staff are regularly granted professional visits with new inmates that are facing

charges in Municipal and Magistrate Court, but only when those inmates request a meeting. *Id.*

Mr. Allen does remember one instance in which he was asked if he had an attorney-client

relationship with the inmate with which he was meeting; because he did not, he was asked to cut

the interview short. *Id.* Plaintiffs also submitted the declaration of Ricky Harris, a criminal defense

attorney in Spartanburg, who stated that he regularly conducts visits with clients in SCDF and has

never been required to affirm that he has an existing attorney-client relationship with an inmate

prior to visiting that inmate. (ECF No. 31-5).

On May 2, 2017, Plaintiffs filed their Complaint (ECF No. 1) alleging that they have a First Amendment right "to speak to inmates in person to inform them of their legal rights, investigate civil rights violations, and discuss the possibility of legal representation in a confidential setting." (ECF No. 1 at 8–9). Plaintiffs allege that Defendants violated this right by prohibiting them from speaking with inmates in person unless Plaintiffs could first demonstrate that they have a pre-existing attorney-client relationship with the inmates. *Id.* at 9. Plaintiffs seek a declaratory judgment that SCDF's policy violates the First Amendment, a preliminary or permanent injunction barring Defendants from enforcing the policy while the suit is pending, and reasonable attorney fees and costs. *Id.* at 10.

On May 3, 2017, Plaintiffs filed the motion for a preliminary injunction that is now before the court. (ECF No. 5). Pertinent to the motion and to this court's analysis are two SCDF policies: Policy 700.0 and Policy 702.0. Policy 700.0, entitled "Inmate Visitation," states, in relevant part, that "[p]rofessional visits will be allowed any day during the week during normal working hours provided the visit does not jeopardize security or normal operation of the detention facility, e.g., the visitor arrives at a time when head count is being conducted, meals are being served, etc." (ECF No. 28-1). The policy defines a "Professional/Legal Visit" as "any visit between an inmate and his/her attorney, legal representative, paralegal, law enforcement, or court official." (ECF No. 28-1). The policy further provides for one non-contact "Social Visitation" per week, in which the inmate selects a visiting period and contacts the visitor to advise them of their visitation slot. *Id.* Policy 702.0, entitled "Inmate Mail Procedures" defines "Privileged Mail" as "mail sent to or received from an attorney or member of the Bar . . . , and mail received from legal representative groups or organizations, i.e. ACLU, etc. . . ." *Id.* The policy further provides that such mail will be opened and inspected for contraband by an officer in the presence of the recipient inmate, but it

will not be read by the officer. *Id.* While all other mail must be in postcard form, Privileged Mail may be in letter-form and may be placed in an envelope to ensure the confidentiality of the content. *Id.*

On June 9, 2017, Defendants filed a response in opposition to this motion. (ECF No. 28). Plaintiffs filed a reply to this response on June 16, 2017. (ECF No. 31). The parties argued their respective points at a hearing before the magistrate judge on June 22, 2017, and this transcript has been made part of the record. (ECF No. 40). The magistrate judge subsequently filed his Report, recommending that Plaintiffs' motion be denied. (ECF No. 33). This motion is now ripe for review.

## PRELIMINARY INJUNCTION STANDARD

A plaintiff seeking a preliminary injunction must establish all four of the following elements: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Because a preliminary injunction is an "extraordinary remed[y] involving the exercise of a very far-reaching power," it is "to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (internal citations omitted). Furthermore, when the administration of a state prison is being challenged, such relief should be granted only in compelling circumstances because at this stage "only preliminary findings as to plaintiffs' likelihood of success on the merits have been made." *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994).[2]

---

[2] Plaintiffs disagreed with the magistrate judge's reliance on *Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994), because the case involved "sweeping intervention in the management" of the prison, whereas the Plaintiffs are challenging one policy. However, this court finds that *Taylor* is persuasive in light of this Circuit's and the Supreme Court's well-established history of being deferential to the administration of state prisons. *See e.g. Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) ("this court has offered considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world"); *Pell v. Procunier*, 417 U.S. 817, 827 (1974) (. . . in the absence of substantial evidence in the record to indicate that the

The purpose of a preliminary injunction is to "preserve the status quo" of the parties until the claims can be fully and fairly investigated. *See Meiselman v. Paramount Film Distrib. Co.*, 180 F.2d 94,97 (4th Cir. 1950). Therefore, such relief should only be granted when the plaintiff can make a clear showing that he or she is likely to succeed on the merits of the claim and that he or she has been irreparably harmed absent injunctive relief. *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 342, 346 – 47 (4th Cir. 2009), *vacated on other grounds by* 559 U.S. 1089 (2010), *restated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) (per curiam).

## ANALYSIS

The magistrate judge ultimately determined that Plaintiffs failed to establish that they were likely to succeed on the merits and that they had not demonstrated that they would suffer irreparable harm absent an injunction. (ECF No. 33). Because the magistrate judge's determination as to those two elements was dispositive, he did not reach a decision on the remaining elements. *Id.* Plaintiffs' objections to the magistrate judge's Report are largely exact copy-and-paste reiterations of arguments made in Plaintiffs' motion, which the magistrate judge has already considered. (ECF No. 38 at 3–10). However, Plaintiffs do make the following objections to the Report: (1) that the magistrate judge erred in finding that Plaintiffs are not likely to prevail on the merits of their claim; (2) that the magistrate judge erred in "not applying the well-established strict scrutiny standard for analyzing First Amendment claims by non-profit civil rights organizations"; (3) that even if the *Turner v. Safely*, 482 U.S. 78 (1987), standard was proper that the magistrate judge erred in "improperly discount[ing] or ignor[ing] evidence showing that Defendants . . .

---

officials have exaggerated their response to [security] considerations, courts should ordinarily defer to [the officers'] expert judgment on such matters"); *Wetzel v. Edwards*, 635 F.2d 283, 288 (4th Cir. 1980) ("federal courts have an additional reason to show deference to the decisions of prison authorities, where a state prison institution is involved") (internal citations omitted).

selectively applied the policy to Plaintiffs"; and (4) that the magistrate judge erred in finding that Plaintiffs "did not show they would suffer actual and imminent harm absent a preliminary injunction." (ECF No. 38). For the reasons stated below, these objections are overruled.

**I. Plaintiffs have failed to show that they are likely to prevail on the merits of their claim.**

Plaintiffs argue that they have a "well-established First Amendment right to speak in person to Detention Center inmates to advise them of their constitutional rights and to recruit potential plaintiffs for civil rights lawsuits." (ECF No. 5 at 11). As the magistrate judge correctly pointed out, Defendants do not challenge the fact that Plaintiffs generally have a right under the First Amendment to pursue litigation as a form of speech. (ECF No. 33 at 6). However, Defendants argue that this does not give Plaintiffs an unfettered right to have uninvited access to inmates for face-to-face interviews. (ECF No. 28 at 5). The undersigned agrees.

In asserting this alleged right, Plaintiffs rely primarily on three cases: *In re Primus*, 436, U.S. 412 (1978); *National Association for Advancement of Colored People v. Button*, 371 U.S. 415 (1963); and *American Civil Liberties Union Fund of Michigan v. Livingston County*, 796 F.3d 636 (6th Cir. 2015). While these cases recognize the specific right to solicit potential litigants as being encompassed within the previously recognized right "to engage in association for the advancement of beliefs and ideas" under the First Amendment, nowhere in these cases does it specifically state that face-to-face contact must be available as the only avenue for such solicitation. *See In re Primus*, 436, U.S. 412 (1978) (holding that the ACLU attorney's letter came "within the generous zone of First Amendment protection reserved for associational freedoms); *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415 (1963) (stating solicitation of prospective litigants was within the right "to engage in association for the advancement of beliefs and public ideas"); *Am. Civil Liberties Union Fund of Michigan v. Livingston Cnty.*, 796

F.3d 636 (6th Cir. 2015) ( stating that the ACLU letters to inmates should be privileged because "an attorney must be able to communicate with an inmate in confidence before litigation and before establishment of a formal attorney-client privilege in order to offer legal advice. . ."). Furthermore, no case law has been provided to support Plaintiffs' contention that they have a "fundamental right" to conduct such in-person interviews with inmates, much less without the inmates' consent to such a meeting. Without such a right, there cannot be the infringement of the right. To the extent that Plaintiffs specifically allege that they have "well-established First Amendment right to *speak in person* to Detention Center inmates to advise them of their constitutional rights and to recruit potential plaintiffs for civil rights lawsuits," (ECF No. 5 at 11) (emphasis added), Plaintiffs could not show a likelihood that they will ultimately prevail on the merits because no such right has been established.

However, in analyzing the motion at hand, both parties and in turn, the magistrate judge, focused more on the Plaintiffs' alleged right to solicit clients, which as stated above, is protected under the First Amendment. To the extent that Plaintiffs' claim that Defendants infringed on this right, the key question is what standard should be applied to determine whether a First Amendment infringement occurred by Defendants' implementation of the visitation policy.

### A. The *Turner* test is applicable to this case.

The magistrate judge determined that for policy reasons, the *Turner* reasonableness inquiry was the proper standard to apply, and this court agrees. However, because the determination of the appropriate standard seems to be dispositive to this motion, this court has explored those policy considerations further.

In *Turner v. Safely*, the Supreme Court addressed the constitutionality of prison regulations in the context of inmate marriages and inmate-to-inmate correspondence. 482 U.S. 78 (1987). The

Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. The Court listed "several factors [that] are relevant to the reasonableness" of a prison regulation: (1) whether the regulation is rationally related to a legitimate and neutral government objective; (2) whether there are alternative avenues to exercise the right that remain open to the inmates; (3) whether there is an impact on the guards and other prisoners in accommodating the asserted right; and (4) whether the existence of easy and obvious alternatives at *de minimis* cost on the pursuit of legitimate goals indicates that the regulation is an exaggerated response by prison officials. *Id.* at 90. However, the burden of proof falls on the prisoner to disprove the validity of the prison regulation at issue. *See id.*; *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Plaintiffs argue that the court should reject the Defendants' argument that the *Turner* reasonableness test applies because *Turner* was focused solely on prisoners' constitutional claims, and Plaintiffs are not prisoners. However, this court agrees with the magistrate judge that the while this distinction is important, the court "must look at the policy at issue in the context in which it is presented – that of a county detention facility." (ECF No. 33 at 8).

In determining that this less-strict standard should apply to assessing whether or not an inmate's rights have been infringed, the *Turner* Court stated that such a standard "is necessary if prison administrators . . . and not the courts are to make the difficult judgments concerning institutional operations." *Turner*, 482 U.S. at 89 (internal citations omitted). The Court further noted that "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Id.* Therefore, if the court was forced to abide by the traditional strict scrutiny analysis in such situations, courts would

be forced to "unnecessarily perpetuate the[ir] involvement . . . in affairs of prison administration." *Id.* (citing *Procunier v. Martinez*, 416 U.S. 396, 407 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989).

This practice of being deferential to the officials running a state prison facility is well-established by both the Supreme Court and the Fourth Circuit Court of Appeals. *See e.g. Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) ("this court has offered considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world"); *Pell v. Procunier*, 417 U.S. 817, 827 (1974) (. . . in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to [security] considerations, courts should ordinarily defer to [the officers'] expert judgment on such matters"); *Wetzel v. Edwards*, 635 F.2d 283, 288 (4th Cir. 1980) ("federal courts have additional reason to show deference to the decisions of prison authorities, where a state prison institution is involved") (internal citations omitted). Specifically, in regards to face-to-face contact with inmates, the Supreme Court has observed that when "the question involves the entry of people into the prisons for face-to-face communication with inmates, it is obvious that institutional considerations, such as security and related administrative problems, as well as the accepted and legitimate policy objectives for the corrections system itself, require that some limitation be placed on visitations," and that in drawing the lines as to what is reasonable, "prison officials must be accorded latitude." *Pell v. Procunier*, 417 U.S. at 826. Therefore, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). This

court believes that these policy considerations support the application of the *Turner* test to the analysis of the pending motion in this case.

However, Plaintiffs argue that the *Turner* test should not apply because Plaintiffs are not inmates and because the courts have not extended the test to apply to non-inmate claims. As the magistrate judge pointed out in his Report, this is not entirely accurate. While it is true that Plaintiffs are not inmates and that the holding in *Turner* was specifically tailored to the situation of infringement of *inmate* rights, the Supreme Court did extend the *Turner* test and analysis to non-inmate publishers asserting First Amendment rights in *Thornburg v. Abbott*, 490 U.S. 401 (1989). In *Thornburg*, the court stated that there was "no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." 490 U.S. at 408. The court focused on which standard of review should apply to prison regulations that limited those publishers' access. *Id.* In its analysis, the court noted that

> [a]ccess [to the prison] is essential to lawyers and legal assistants representing their prisoner clients, to journalists seeking information about prisoner conditions, and to families and friends of prisoners who seek to sustain relationships with them. All of these claims to prison access undoubtedly are legitimate; yet prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. Acknowledging the expertise of these officials and that the judiciary is "ill equipped" to deal with the difficult and delicate problems of prison management, this court has afforded considerable deference to the determinations of prison

administrators who, in the interest of security, regulate the relations between prisoners and the outside world.

*Id.* at 407–408.

The *Thornburgh* court ultimately determined that the *Turner* approach was proper, noting that the *Turner* court essentially considered that "a strict standard simply was not appropriate for consideration of regulations that are centrally concerned with maintenance of order and security in prisons." *Id.* (internal citations omitted). In light of the concern that a strict approach would "fail[] to afford prison officials sufficient discretion to protect prison security," the *Thornburg* court held that "regulations affecting the sending of a publication to a prisoner should be analyzed under the *Turner* reasonableness standard." While the *Thornburgh* court's holding was limited to the narrow instance in which publishers wished to assert their First Amendment rights by sending publications into the prison, it is noteworthy that the Supreme Court was willing to extend the *Turner* analysis to a case involving non-prisoner constitutional rights being allegedly infringed upon by prison policy. Furthermore, the court specifically stated that the reason that it extended the *Turner* test and analysis to that case was for policy reasons for giving deference to the administrative workings of a prison. *See id.*

Plaintiffs further assert that the magistrate judge erred in ignoring the context in which *Thornburgh* was decided. (ECF No. 28). Plaintiffs reiterate that in *Thornburgh*, the Supreme Court merely discerned between incoming correspondence from prisoners and incoming correspondence from non-prisoners, focusing on the security implications of each. *Thornburgh*, 490 U.S. at 413. Therefore, instead of following the policy considerations set forth above, Plaintiffs argue that this court should instead adopt the reasoning in *Strum v. Clark*, a Third Circuit case in which an attorney asserted her First Amendment right to speak with clients and non-clients within a prison

13

context. 835 F.2d 1009 (3rd Cir. 1987). In that case, the court rejected the *Turner* analysis, stating that it was only applicable to the constitutional rights of prisoners, and evaluated the plaintiff's claim "in light of conventional first amendment doctrine . . . not in light of the less demanding standard involving only prisoners' rights." *Strum v. Clark*, 835 F.2d 1009, 1014 (3rd Cir. 1987). In rationalizing this decision, the court noted that the "reasonable relation test . . . ha[d] been applied to modify *only* the constitutional rights of prisoners." *Id.* (emphasis added).

Notably, the *Strum* decision preceded the decision in *Thornburgh* by two years. At the time of *Strum*, it was true that the *Turner* test had not been used in any case other than a case of inmate rights. However, *Thornburgh* changed this, and it brought along with it the policy consideration for why courts might be inclined to be deferential to prison policy even when dealing with non-inmate constitutional rights. For this reason, this court finds Plaintiffs reliance on *Strum* unpersuasive.

Therefore, this court agrees with the magistrate judge that the *Turner* reasonableness test should apply in this case. The magistrate judge applied the *Turner* reasonableness test to the facts of this case in his Report. (ECF No. 33). However, the Plaintiffs have objected to the magistrate judge's analysis as to all four factors. These objections are overruled for the reasons stated below.

### i. SCDF's policy is rationally related to a legitimate and neutral government objective.

The Plaintiffs argue that Policy 700.0 is not rationally related to any legitimate, neutral government objective. This court disagrees. The Defendants have stated that the regulation is related to its interest in limiting the visitors of SCDF, which Defendants claim to be of "preeminent importance in running a jail." (ECF No. 28 at 8). Plaintiffs assert that this is not a legitimate government objective. However, in Defendant Freeman's affidavit, he stated that the visitation

policy "is in place to protect the safety and security of the SCDF staff, the inmates, and the visitors of the facility." (ECF No. 28-2 at 3). He further stated that SCDF "simply does not have the staff resources to accommodate requests such as the request made by Plaintiff" because whenever an inmate is transported for such a meeting, he or she "must be accompanied by at least one Deputy." *Id.* That Deputy must then remain "in close proximity" to the meeting in order to escort the inmate back to his or her regularly assigned area at the conclusion of the visitation. *Id.* He further mentioned that because "SCDF is already understaffed" this would mean having to pull a Deputy from his or her regularly assigned duties in order to accommodate such visits and that this "creates a real and legitimate concern to the overall jail operations." *Id.*

As the Plaintiffs have pointed out in their objections, the Fourth Circuit has identified three penological objectives in the operation of a jail: preserving order, preserving discipline, and maintaining institutional security. *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 469 (4th Cir. 1999). Plaintiffs allege that Defendants have failed to demonstrate how this policy furthers any of those three objectives. However, this court finds that Defendants have shown that this policy is in place as an effort to maintain order and security in the prison, which are legitimate penological objectives.

Plaintiffs also contend that Defendants do not apply the challenged policy in a neutral manner. (ECF No. 38 at 25). Plaintiffs state that the policy, as written, distinguishes between attorneys who have a preexisting relationship with inmates and those that do not, which Plaintiff claims is not "neutral." Furthermore, Plaintiffs assert that the Defendants "selectively use the policy to block Plaintiffs from meeting with inmates they do not represent while allowing other attorneys to do so on a regular basis." (ECF No. 38 at 25). This court disagrees.

The policy, as written, does distinguish between those that classify as "Professional visitors," i.e. "[the inmate's] attorney, legal representative, paralegal, law enforcement, or court official" and "social visitors," which encompass family members, friends, and other individuals on a visitation list. (ECF No. 28-1 at 2). However, this does not make the policy discriminatory against civil rights organizations as Plaintiff suggests. Any attorney that does not represent the inmate, by SCDF policy, is classified as a "social visitor" and must abide by the rules accordingly. The policy does not bar civil rights groups or unretained attorneys from meeting with an inmate; the inmate can meet with those individuals if they choose to do so by following the social visitation guidelines. (ECF No. 28-1).

Plaintiffs contend that the Defendants do not apply their policy in a neutral manner so that it essentially discriminates against just civil rights groups looking to solicit potential inmate-clients. Plaintiffs assert that this allegation is supported by the declarations of Mr. Allen and Mr. Harris. Mr. Allen's declaration states that he and his staff routinely meet with inmates despite not representing them, and that he has only once been forced to cut his meeting short with an inmate because he did not represent the inmate. (ECF. No. 31-4). Mr. Harris's declaration states that he has never been asked to provide evidence that he represents the inmate when meeting with inmates at the prison. (ECF No. 31-5).

While these facts might show that the policy is not always enforced as it is supposed to be, the court fails to see how the implementation of the policy, when enforced properly, is discriminatory. At Plaintiffs' own admission, the ACLU attorneys were able to meet with inmates multiple times after having their requests denied by SCDF because no one asked them whether or not they represented the inmate with whom they were meeting. (ECF No. 5). However, it was only when one officer *did* remember to enforce the policy that the ACLU attorneys were asked to leave.

In his affidavit, Defendant Freeman stated that the Plaintiffs being granted access was "an error on the part of the desk clerk and not in keeping with SCDF policy." (ECF No. 28-2 at 3). The same is true for the instances in which the Public Defender and Mr. Harris have been able to visit inmates without proof that they represent the inmate – someone has not followed the policy. However, when the policy is adequately implemented, if the person does not represent the inmate in question, that person is asked to leave. (ECF No. 28-1). The Public Defender was once asked to leave for this reason, as noted in his declaration. (ECF No. 31-4). The policy is, therefore, not implemented solely against the ACLU and other civil rights groups as Plaintiffs suggest.

Plaintiffs further contend that the fact that Defendants have not consistently adhered to the policy is evidence that the prison's objective is not actually legitimate. Plaintiffs state that the ACLU attorneys do not pose a security threat to the prison. (ECF No. 38 at 26). Plaintiffs cite *State v. Walker*, which says that "[b]ecause an attorney is considered an officer to the court, there is no reason to suspect that he or she would be a threat to prison security discipline." 804 N.W. 2d 284, 294 (Iowa 2011). However, neither the Defendants nor the magistrate judge implied that the ACLU attorneys were the security threat with which the prison was concerned. Defendants have stated that when these visits take place, Deputies have to be pulled from their regularly assigned stations in order to escort inmates to and from meetings. (ECF No. 28-2). They have further stated that they are understaffed and that this puts a burden on the Deputies. (ECF No. 28-2). It seems that SCDF is concerned with the security threat of having to move around its officers in order to escort inmates, not the security threat of an attorney coming into the building. Therefore, this court finds that the objective is legitimate and neutral.[3]

---

[3] Findings as to each of the four factors are based on facts presented at the time of this Order and are pertinent only to the issue of whether or not to grant this preliminary injunction.

### ii. There are alternative avenues that remain open for the ACLU attorneys to solicit clients.

Plaintiffs contend that there is no sufficient alternative avenue that remains open for them to solicit clients in the prison. This court disagrees. As stated by the SCDF policy 702.0, ACLU mail is considered "privileged" mail. (ECF No. 28-1). Therefore, while officers may inspect the contents of the letter for contraband in front of the recipient inmate, they may not read the letter; the letters are considered confidential. *Id.* The ACLU attorneys can effectively alert the prisoners of their potential rights and may recruit potential plaintiffs through this system. Additionally, if the ACLU attorneys want to meet with the inmates in person, they may write a letter to the inmates asking for the inmates to place the ACLU attorneys on their visitation lists or to establish an attorney-client relationship. *See id.* For example, this can be accomplished through correspondence that explains the purpose of the communication and includes a limited engagement letter for the inmate to sign, which establishes an attorney-client relationship. This court finds that this is a sufficient alternative avenue in which the ACLU may contact and solicit potential inmate-plaintiffs.

### iii. Allowing ACLU attorneys access to visit prisoners with whom they do not represent under the "Professional visitor" policy would negatively impact the guards and prisoners and would burden prison resources.

Plaintiffs object to the magistrate judge's determination that if the ACLU attorneys are allowed to meet with non-clients that it would put a burden on prison resources. However, as discussed above, Defendant Freeman has clearly stated that the facility is understaffed and that for each of these visits, a Deputy must be pulled from his assigned duties in order to escort the inmate to and from the meeting. (ECF No. 28-2). Plaintiff's objections are again misguided by the

misunderstanding that SCDF is concerned with the *attorneys* being a security threat. Plaintiff asserts that the fact that the attorneys were not screened with metal detectors or patted down upon arrival on their final day of meeting with the inmates shows that there is no real threat. This court, again, disagrees with the notion that this is the threat that the facility is concerned with. Because prison resources, i.e. the Deputies, would have to be reassigned in order to accommodate Plaintiffs' requests and because the prison is already understaffed, this court finds that accommodation of the Plaintiffs' requests would place a burden on the prison and guards.

### iv. The regulation is not an exaggerated response by prison officials.

Plaintiffs object to the magistrate judge's determination that SCDF's response is not exaggerated and that there are no ready alternatives to the policy at a *de minimus* cost to penological interests. (ECF No. 38 at 31). The only available alternative that this court sees is to allow Plaintiffs to conduct interviews according to the Professional visitation policy instead of according to the social visit policy. However, as discussed above, this would place a heavy burden on the allocation of limited resources in the prison. Additionally, relocating Deputies in order to accommodate Plaintiffs' request could pose a substantial safety risk within the prison because the Deputy's previously-assigned station would be un-manned. Therefore, this court finds that the SCDF's response is not exaggerated and that the implementation of the Plaintiffs' request would place a non-*de minimus* burden on penological interests – i.e. on the security and order of the prison.

### v. Plaintiffs have failed to make a clear showing that they are likely to succeed on the merits under the *Turner* analysis.

After considering each of the four factors enumerated in *Turner*, this court finds that Plaintiffs have failed to make the requisite showing that they are likely to succeed on the merits of their First Amendment claim.

**B. Even if the *Turner* test was not applicable, the Plaintiffs have not shown that they are likely to succeed on the merits of their claim because the policy is a reasonable time, place, and manner restriction of content-neutral speech.**

Plaintiffs contend that strict scrutiny is applicable to this case because it is the "conventional first amendment doctrine." (ECF NO. 38 at 19). However, when the regulated speech is content-neutral, the type of scrutiny applicable to a First Amendment challenge depends on the type of forum where the speech is regulated. *See Perry Ed. Ass'n. v. Perry Local Educator's Assn.*, 460 U.S. 37, 46 (1983). In *Perry*, the Supreme Court identified three categories of public forums: (1) those traditionally designated for public use; (2) those properties that the government opens for use by the public as a place to express ideas; and (3) those types of public property that are not used traditionally for public communication. *Id.* The guidelines for how the government may regulate speech is different as to each of these types of forum. *Id.*

This court finds, for the reasons stated above in the *Turner* analysis, that the SCDF policy regulates content-neutral speech. This court further finds that SCDF falls within the third category of forum, much like the prison did in Plaintiffs' proffered case, *Strum v. Clark*, 835 F.2d 1009 (3rd Cir. 1987). When a forum falls within this third category, the government may make "time, place, and manner" regulations so long as the regulation on speech is "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46. These restrictions are considered reasonable "if they are imposed without reference to the content of the regulated speech . . . serve a significant governmental interest, and leave open ample

alternative channels of communication." *Strum*, 835 F.2d at 1015 (internal citations omitted).

Additionally, "[t]he nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable." *Pell v. Procunier*, 417 U.S. 817, 826 (1974). In the context of a prison, normal activity "necessarily requires that considerable attention be devoted to the maintenance of security." *Id.*

In *Pell v. Procunier*, in the context of inmates asserting their constitutional rights for face-to-face communications with newsmen, the court stated that while this does not mean that prison officials have an unfettered right to limit all types of expression within the prison, "security considerations are sufficiently paramount in the administration of the prison to justify the imposition of some restrictions on the entry of outsiders into the prison for face-to-face contact with inmates." *Id.* Furthermore, in determining whether limiting the face-to-face contact between the press and the prisoners was a reasonable time, place, and manner restriction, the court considered that "keeping visitations at a manageable level that will not compromise institutional security" was a consideration that was "peculiarly within the province and professional expertise of corrections officials, and [that] in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should defer" to the prison's judgment in such matters. *Id.* at 827.

This court finds that SCDF's policy is a proper time, place, and manner restriction that is reasonable and does not seek to suppress a particular view or statement. The regulation does not seek to prohibit a certain viewpoint of speech. Additionally, as noted in *Pell v. Procunier*, keeping visitation to a manageable level can have substantial effects on institutional security. *See id.* Furthermore, as stated previously, the security and order of the prison are of paramount interest to SCDF. Accordingly, this is a legitimate, significant penological interest. *See In re Long Term*

*Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 469 (4th Cir. 1999). Furthermore, as discussed above, there are alternative channels for the ACLU to communicate with the inmates – the legal mail system and the social visitation system. If the inmate chooses to have ACLU come to the prison for visitation, that inmate can put the ACLU on his or her visitation list or can establish an attorney-client relationship with an ACLU attorney. Therefore, based on these facts, this court finds that the regulation is a reasonable time, place, and manner restriction. Accordingly, based on the information presented to the court at this stage of the proceedings, Plaintiffs have not shown a likelihood of success on the merits even if the *Turner* test was not applied.

## II. Plaintiffs have not demonstrated that they will suffer actual and imminent harm absent a preliminary injunction.

Because Plaintiffs have not made a showing that they are likely to succeed on the merits of their claim based on the facts presently before the court, Plaintiffs fail to meet the test for a preliminary injunction. However, since the Plaintiffs objected to the magistrate judge's determination that they were not likely to suffer actual or imminent harm absent this relief, the court will address this objection. Plaintiffs are correct that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976). However, as stated earlier, Plaintiffs have not made the necessary showing as to their First Amendment claim.

Plaintiffs allege that they are seeking to exercise their right to "communicate with inmates" in order to solicit them for potential litigation, and that this will be hampered by not being allowed to exercise this right. However, Plaintiffs may confidentially communicate with inmates through the use of SCDF's legal mail system. (ECF No. 28-1). Inmates may then set up face-to-face

communications with the ACLU attorney either by (1) putting the attorney on the social visit list or (2) establishing an attorney-client relationship with the ACLU attorney. Even with the denial of this injunction, Plaintiffs can contact inmates, alert them of their rights, solicit them for potential cases, and set up meetings with the inmates. Therefore, this court finds that Plaintiffs will not be irreparably harmed in the absence of a preliminary injunction.

## CONCLUSION

After a careful and thorough review of the record under the appropriate standards, as set forth above, the court adopts the Report (ECF No. 33), which is incorporated herein by reference, to the extent that it is consistent with this Order. For the reasons set forth in the Report and in this Order, the Respondent's motion for a preliminary injunction (ECF No. 5) is **DENIED**.[4]

s/Timothy M. Cain
United States District Judge

Anderson, South Carolina
November 21, 2017

---

[4] The court does not reach the issue of the other two elements of the *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, (2008) test for when a preliminary injunction is appropriate because Plaintiff has failed to prove elements one and two. These two elements are dispositive of the motion for a preliminary injunction because a Plaintiff must prove all four elements of the test in order to obtain such relief.